Simon NASH, Plaintiff-Appellant,

v.

Joseph A. CALIFANO, Jr., Stanford Ross, Alan K. Campbell, Robert L. Trachtenberg, Philip T. Brown, and Wallace Tannenbaum, Defendants-Appellees.

No. 556, Docket 79–6180.

United States Court of Appeals, Second Circuit.

Submitted Dec. 18, 1979.

Decided Jan. 7, 1980.

Simon Nash, pro se.

Alice Daniel, Acting Asst. Atty. Gen., Washington, D. C., Richard J. Arcara, U. S. Atty., Buffalo, N. Y., Robert Kopp, Barbara B. O'Malley, Kenneth J. Barnes, Civil Division, Dept. of Justice, Washington, D. C. (Burton Berkley, Sp. Counsel, Office of Hearings and Appeals, Social Security Administration and Sherry J. Leiwant, Asst. Regional Atty., Dept. of Health, Education and Welfare, Washington, D. C., of counsel), for defendants-appellees.

Before KAUFMAN, Chief Judge, and SMITH and TIMBERS, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

Federal courts must pay scrupulous heed to Article III's limitation of our jurisdiction to actual cases or controversies. This requirement girds our judicial power within its proper sphere, and thereby legitimizes its exercise. Yet the doctrines of standing and justiciability, in which the case or controversy requirement plays an important part, must not be applied so as to deprive litigants of an authoritative resolution of genuine disputes. In the case at bar, Judge Elfvin found that an Administrative Law Judge subjected to an allegedly unauthorized regime of monitoring, evaluation and control had not suffered the injury-in-fact required by the doctrine of standing. He therefore granted defendants' motion for summary judgment and dismissed the action.[1] We reverse, holding that the alleged invasion of the appellant's statutory right to decisional independence, as set forth in the amended complaint, presents a justiciable controversy, and that the appellant has standing to bring suit. We do not, of course, express any views on the merits of appellant's claims.

## I.

The appellant, Simon Nash, is an Administrative Law Judge (ALJ) of 22 years' experience in the Social Security Administration's Bureau of Hearings and Appeals.[2] The Bureau's ALJs, under authority directly delegated by the Secretary of Health, Education and Welfare (HEW),[3] hold hearings and decide appeals from agency denials of various claims for Social Security benefits.[4]

The Bureau's corps of approximately 650 ALJs is divided among 145 field offices, each one headed by an Administrative Law

---

1. Appellees filed their initial motion to dismiss, or, in the alternative, for summary judgment, addressed to the original complaint. After an amended complaint was filed, the appellees renewed their motions. Since affidavits and other documents were considered by the judge, the Rule 12(b)(6) motion, pursuant to that Rule, was "treated as one for summary judgment" as if brought under Rule 56.

2. The statutory title of "Administrative Law Judge" was bestowed upon federal hearing examiners by P.L. 95–251, 92 Stat. 183 (1978). In January 1979, the name of the Bureau of Hearings and Appeals was changed to "Office of Hearings and Appeals" and its Director became an Associate Commissioner of the Social Security Administration. In the interest of consistency, however, we shall refer to the Office as the Bureau of Hearings and Appeals throughout.

3. The Social Security Administration is now part of the newly reorganized Department of Health and Human Services, whose Secretary is Patricia Roberts Harris.

4. Appeals from denials of claims for Disability Insurance and Supplemental Security Income benefits under the Social Security Act, 42 U.S.C. §§ 423 & 1381a, constitute a large proportion of the caseload of ALJs within the Bureau. Indeed, in over 90% of cases, the issue is whether the claimant is disabled. The hearings, which are conducted pursuant to section 205(b) of the Social Security Act, 42 U.S.C. § 405(b), must conform to the requirements of the Administrative Procedure Act, 5 U.S.C. § 551ff.

Judge in Charge (ALJIC), who has managerial and administrative authority over all personnel assigned to his or her field office, in addition to responsibility for the same caseload as other ALJs. ALJICs receive the same salaries as other ALJs. Each ALJIC reports to one of the ten Regional Chief Administrative Law Judges who, in turn, are under the managerial authority of the Director of the Bureau of Hearings and Appeals and his chief assistant, the Chief Administrative Law Judge. While Administrative Law Judges are civil service employees, the Director of the Bureau is appointed by, and serves at the pleasure of, the Commissioner of the Social Security Administration.

In December of 1967, Judge Nash became ALJIC for the Buffalo field office. During his tenure in that position, he, along with numerous other ALJICs, urged adoption of a number of administrative reforms—including the hiring of staff attorneys and the use of summary opinions in appropriate cases—to cope with the mounting backlog of cases before the Bureau of Hearings and Appeals. These pleas for reform went unheeded until 1975, when appellee Robert Trachtenberg was appointed Director of the Bureau.[5] Facing a record backlog of 113,-000 cases,[6] Director Trachtenberg instituted many of the reforms long advocated by Nash and his colleagues.

Trachtenberg's goal of eliminating unconscionable delays in processing appeals is, of course, commendable. Appellant, however, alleges that appellees and their staff employees have interfered with the decisional

independence of the administrative law judges in violation of the Administrative Procedure Act, the Social Security Act and the due process clause of the Fifth Amendment. On January 19, 1978, Nash filed a formal grievance against Regional Chief ALJ Tannenbaum, alleging that he had interfered improperly with the internal operations of the Buffalo field office. One month later, Tannenbaum summarily demoted plaintiff from his position as ALJIC to ALJ, affording him neither a statement of reasons, nor any opportunity for a hearing.

On May 30, 1978, Nash, proceeding *pro se*, filed a lengthy complaint in the United States District Court for the Western District of New York seeking his reinstatement as ALJIC, and a judgment declaring invalid a number of official actions allegedly performed by Director Trachtenberg and his administrative subordinates. On September 27, 1978, Judge Elfvin denied plaintiff's motion for a preliminary injunction, noting, *inter alia*, that since his demotion from ALJIC to ALJ entailed no loss of income, he could not be said to have suffered irreparable injury. The issue of appellant's demotion, however, is not before us on this appeal for, on December 20, 1978, appellant (represented by counsel at this juncture) filed an amended complaint challenging six allegedly unlawful practices instituted by the defendants, and carefully avoided any mention of his demotion.

The first practice challenged in the complaint is the Bureau's "Regional Office Peer Review Program." According to Nash,

---

**5.** Mr. Trachtenberg resigned as Associate Commissioner of the Social Security Administration effective May 1, 1979, and was replaced by Andrew J. Young, effective October 22, 1979. The other defendants are the Secretary of Health, Education & Welfare, Joseph A. Califano, Stanford Ross, Commissioner of Social Security, Alan K. Campbell, Chairman of the U. S. Civil Service Commission, Philip T. Brown, Chief Administrative Law Judge of the Bureau of Hearings and Appeals and Wallace Tannenbaum, Regional Chief Administrative Law Judge of Region II, which includes all field offices located in New York State, New Jersey and Puerto Rico.

**6.** Several courts have found that the long delays in processing appeals from denials of Social Security benefits have denied claimants the right to a hearing within the reasonable time called for by 42 U.S.C. § 405(b). In *White v. Mathews*, 559 F.2d 852 (2d Cir. 1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978), this court affirmed an order granting prospective benefits to claimants who had not received administrative adjudication of their claims within specified time periods. Similar cases include *Caswell v. Califano*, 583 F.2d 9 (1st Cir. 1978) and *Blankenship v. Mathews*, CCH Unemployment Ins. Rep. ¶ 14739 (W.D.Ky., May 6, 1976).

Trachtenberg, Brown and Tannenbaum, as well as non-ALJ members of their staffs, known as "Development Center Analysts" and "Program Operation Officers," review the work of ALJs outside the normal appellate process. In conjunction with this ongoing review, the appellees or their staffs give plaintiff and all other ALJs detailed, purportedly mandatory instructions concerning the proper length of hearings and opinions, the amount of evidence required in specific cases, and the proper use of expert witnesses. Through the Peer Review Program, the Bureau has allegedly arrogated to itself the power to control the conduct of hearings vested in ALJs by the Administrative Procedure Act, 5 U.S.C. § 556.

Nash also avers that an arbitrary monthly production quota has been established for him and all his colleagues. Unless an ALJ renders a specified number of decisions per month, the agency, appellant claims, threatens to file incompetence charges against him with the Civil Service Commission.[7] In his view, the agency's production quota constitutes a performance rating forbidden by the Administrative Procedure Act, 5 U.S.C. § 4301(2)(E) and 5 C.F.R. § 930.211.

An additional threat to the ALJs statutory independence is allegedly posed by the so-called "Quality Assurance Program," which attempts to control the number of decisions denying Social Security Benefits. The agency has "let it be known" that the average 50% "reversal rate" for all ALJs is an "acceptable" one. Appellant further claims in his amended complaint that the reversal rates of all ALJs are monitored, and those who deviate from the mean are counseled and admonished to bring their rates in line with the national average. This attempt to influence the ALJs' decisionmaking process, it is urged, violates 5

U.S.C. §§ 556 & 3105 and the Fifth Amendment to the Constitution.

Nash's fourth claim centers upon plans that call for the national implementation (in whole or in part) of an "Employee Pool System" developed at the White Plains, New York field office with the knowledge and approval of the Director. Under this program, many of the ALJs' judicial responsibilities—including the writing of decisions—are vested in clerical and managerial personnel. The use of such "mass production" techniques, it is charged, violates 5 U.S.C. §§ 556(c) & 3105.

The amended complaint goes on to contest the authority of the Secretary of HEW to delegate the power to hold hearings to members of the Appeals Council. Although no members of the Council are alleged to have held hearings in that capacity, Nash asserts that such power may be vested only in an ALJ. Finally, he contends, the Chief ALJ and the 10 Regional Chief ALJs improperly combine judicial and managerial duties in violation of 5 U.S.C. § 3105.

On June 4, 1979, the district court heard argument on appellant's motion for certification of a class consisting of all ALJs similarly situated, and on appellees' motion to dismiss the complaint for failure to state a claim, or in the alternative for summary judgment. Without addressing Nash's claims separately, but after considering affidavits and submitted documents, Judge Elfvin, apparently treating the motion as one for summary judgment, dismissed the amended complaint for lack of standing in a colloquial statement delivered after argument, since he found "nothing right here and now that lands on . . . Judge Nash."[8] No written opinion was filed by the district judge. Judgment dismissing

---

7. In 1978, Congress enacted the Civil Service Reform Act of 1978, P.L. 96–454, 92 Stat. 1119 (1978), which abolished the Civil Service Commission and substituted in its place the Office of Personnel Management and Merit Systems Protection Board. Although the Act worked a substantial revision of the Civil Service system, it did not alter the statutory status of ALJs. In the interest of clarity, we shall continue to refer to the Office of Personnel Management as the Civil Service Commission throughout this opinion.

8. The district judge also stated that if his standing determination were reversed on appeal, he would grant the motion for class certification. We assume that Judge Elfvin's observation that plaintiff is a "capable" class representative was premised upon the fact that he was represented by counsel at that time.

the complaint was entered on July 10, 1979 and this appeal, *pro se,* followed.

## II.

Article III limits federal judicial power to the adjudication of "cases or controversies." Thus, a threshold question in every suit is whether plaintiff has alleged that he has in fact suffered (or is imminently subject to suffering) a cognizable injury. *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Beyond this irreducible constitutional requirement, courts have come to weigh a number of "prudential" considerations to determine whether the complainant is a proper plaintiff to raise and litigate the controversy alleged. Thus, in *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970), the Court required that "the interest sought to be protected by the complainant [be] arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Accord, Boston Stock Exchange v. State Tax Commission,* 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977).[9]

The appellees attempt to cast Nash in the role of a plaintiff contesting the validity of a penal statute or the policies of a prosecuting authority when he is neither prosecuted nor threatened with prosecution. *See S. v. D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 793 (1973); *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Massachusetts v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). In so doing, they misperceive the essential nature of Nash's complaint, and ignore the principle that "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *S. v. D., supra,* 410

U.S. at 617 n.3, 93 S.Ct. at 1148 n.3, *accord, Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Hardin v. Kentucky Utilities Co.,* 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968). The gravamen of appellant's complaint is that rights conferred upon him and all other ALJs by statute, regulation and prior agency practice are being continuously infringed by the appellees' actions. Accordingly, we must turn to the sources of the right asserted to assess appellant's claim of injury.

## III.

As *Data Processing* stressed, standing analysis does not examine the merits of the underlying claim. 397 U.S. at 153, 90 S.Ct. 827. Rather, our inquiry centers solely upon the allegations of the complaint. Taking these allegations to be true, as we are required to do on an appeal from the dismissal of a complaint for lack of standing, *Warth v. Seldin, supra,* 422 U.S. at 501, 95 S.Ct. 2197, we must determine whether the alleged inroads on ALJs' decisional independence are arguably within the zone of interests protected by the Administrative Procedure Act and Social Security Act. Although Nash purports to represent a class of ALJs, he must, as class representative, allege the required injury on his own behalf. *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

As originally enacted in 1946, the Administrative Procedure Act (APA) vested hearing examiners (as ALJs were then called) with a limited independence from the agencies they served. The hearing examiners had previously been on a par with other agency employees, their compensation and promotion dependent upon agency ratings. The expanding scope of agency activity during the 1930s and early 1940s led to increasingly heavy criticism,[10] however, be-

---

9. In *Data Processing,* moreover, the Court gave the constitutional branch of the standing requirement an expansive reading, opining in *dictum* that noneconomic or nonpunitive injuries to aesthetic, conservational or recreational interests, or an injury to one's spiritual stake in First Amendment values would be sufficient to

establish constitutional standing. 397 U.S. at 154, 90 S.Ct. 827.

10. *See, e. g.,* Administrative Procedure Act—Legislative History, S.Doc.No.248, 79th Cong.2d Sess. (1946); Thomas, *The Selection of Federal Hearing Examiners: Pressure*

cause the hearing examiners came to be perceived as "mere tools of the agency concerned." *Ramspeck v. Trial Examiners Conference*, 345 U.S. 128, 131, 73 S.Ct. 570, 572, 97 L.Ed. 872 (1953). In response, Congress enacted § 11 of the APA, removing control over the hearing examiners' tenure and compensation from the agencies and vesting it, to a large degree, in the Civil Service Commission.

The APA provides that ALJs "are entitled to pay prescribed by the Office of Personnel Management independently of agency recommendations or ratings." 5 U.S.C. § 5372. In addition, section 4301 and its implementing regulation (5 C.F.R. § 930.211) exempts ALJs from the performance ratings prescribed for other civil service employees. ALJ tenure, moreover, is specially safeguarded by 5 U.S.C. § 554, which provides that ALJs, unlike other civil servants, may not be removed without a formal adjudication.

These statutory provisions draw upon the more ancient wisdom grounded in history and contained in Article III, which safeguards federal judicial independence through still more stringent compensation and tenure provisions. *See* Kaufman, *Chilling Judicial Independence*, 88 Yale L.J. 681 (1979). The independent judiciary is structurally insulated from the other branches to provide a safe haven for individual liberties in times of crisis.[11] By analogy, "the process of agency adjudication is currently structured so as to assure that the hearing examiner exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency." *Butz v. Economou*, 438 U.S. 478, 513, 98 S.Ct. 2894, 2914, 57 L.Ed.2d 895 (1978).

It is clear that these provisions confer a qualified right of decisional independence upon ALJs. First recognized by the Su-

preme Court in *Ramspeck v. Trial Examiners Conference*, 345 U.S. 128, 73 S.Ct. 370, 97 L.Ed. 872 (1953), this special status is a creation of statute, rather than the Constitution. And as their role has expanded, the ALJs' functional comparability to judges has gained recognition. For example, in *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Supreme Court held that ALJs enjoy absolute immunity from liability in damages for actions taken in their quasi-judicial capacity.

The Social Security Administration has, moreover, recognized the limitations upon its power over the ALJs' decisionmaking process. The position description for ALJs issued by the Administration's Bureau of Hearings and Appeals states that ALJs possess "full and complete individual independence of action and decision . . . without review [and] full responsibility and authority" for the conduct of hearings and the disposition of cases. "The Social Security and Administrative Procedure Acts," the description continues, "prohibit substantive review and supervision of the [ALJ] in the performance of his quasi-judicial functions. His decisions may not be reviewed before publication, and after publication only by the Appeals Council in certain prescribed circumstances. He is subject only to such administrative supervision as may be required in the course of general office management."

It is not insignificant that when Director Trachtenberg instituted the extraordinary review and counseling practices challenged in Nash's complaint, he recognized their potential dangers. In a memorandum dated February 7, 1977 to the Regional Chief ALJs setting forth the Regional Office Peer Review Program, he wrote:

"You can readily discern from this memorandum my concern and, indeed, my resolve that none of these programs, including this new regional technical review

*Groups and the Administrative Process*, 59 Yale L.J. 431 (1950).

11. *See* E. Burke, *Reflections on the Revolution in France* 242 (T. Mahoney ed. 1952). The ideal of judicial independence antedates the Constitution. Indeed, one of the grievances against

George III listed in the Declaration of Independence was: "He has made Judges dependent on his will alone, for the tenure of their offices, and the amount and payment of their salaries."

effort, should denigrate or undermine the ALJs' substantive independence. While these programs can serve a needed, valued public service, in the wrong hands, with the wrong attitude, and without constant vigilance, they could cause a serious setback to the system of administrative justice of which we all rightly should be proud. Simply stated, I will not let this occur and, rather than countenance any such possible effect, I would rescind any or all portion [sic] of these programs. "I am confident, however, that these programs will succeed as designed and intended. I have a particular sense of confidence that, under your close supervision, you will not permit any abridgement of the ALJs' independence and that your peer review role will be handled with sophistication and sensitivity."

Although these statements may be probative of an essentially benign intent on the appellees' part, the memorandum leaves little doubt that it was recognized that the management initiatives it set into motion could well impinge upon the zone of interests protected by the APA.

Director Trachtenberg apparently entertained similar doubts as to the propriety of instituting special programs for low-producing and high- and low-reversing ALJs. In a letter dated November 1, 1977, he solicited the comments of the Executive Director of the U. S. Civil Service Commission on possible conflicts between the Quality Assurance System and the Administrative Procedure Act or Civil Service Commission regulations. The Executive Director was of the opinion that the system, as outlined to him, would not violate the APA but qualified his

statement appropriately: "Agency programs which seek to enhance the efficiency and quality of an adjudicatory program are in the public interest *so long as they do not impinge upon the decisional independence of Administrative Law Judges.*" (emphasis supplied).

The APA creates a comprehensive bulwark to protect ALJs from agency interference. The independence granted to ALJs is designed to maintain public confidence in the essential fairness of the process through which Social Security benefits are allocated by ensuring impartial decisionmaking. Since that independence is expressed in terms of such personal rights as compensation, tenure and freedom from performance evaluations and extraordinary review, we cannot say that ALJs are so disinterested as to lack even standing to safeguard their own independence. *See Carter v. Jury Commission of Greene County,* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970).[12]

The scrutiny and affirmative direction alleged by Nash reaches virtually every aspect of an ALJ's daily role. Under the Quality Assurance System and the Peer Review Program, the number of reversals, the number of dispositions, and the manner of trying and deciding each case are recorded and measured against prescribed standards. ALJ Nash and his colleagues allegedly receive mandatory, unlawful instructions regarding every detail of their judicial role. Nash, therefore, has "the personal stake and interest that impart the concrete adverseness required by Article III." *Barlow v. Collins,* 397 U.S. 159, 164, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).[13]

---

**12.** In *Carter* the Supreme Court held that Black citizens who were fully qualified to serve as jurors under state statute, but nonetheless were excluded because of their race, had standing to seek a judgment declaring the selection process unconstitutional. *Carter, supra,* 396 U.S. at 329–30, 90 S.Ct. 518. The Court concluded that the plaintiffs had been injured in fact by restrictive selection practices because the exclusion on account of race was " 'practically a brand upon [the jurors], . . . an assertion of their inferiority.' " *Id.* at 330, 90 S.Ct. at 524, *quoting Strauder v. West Virginia,* 100 U.S. 303, 308, 25 L.Ed. 664 (1879). It went

on to note, moreover, that the discrimination evidenced in the record "contravenes the very idea of a jury. . . . 'a body truly representative of the community.' " *Id., quoting Smith v. Texas,* 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84 (1940). Just as Carter was permitted to assert an interest in the integrity of the jury system, Nash should be permitted to assert his analogous interest in the decisional independence of the ALJs.

**13.** The appellees, in their briefs, direct this court's attention to an agreement entered into by defendants in settlement of an action enti-

The second branch of the *Data Processing* test—the zone of interest requirement—is amply satisfied by the legislative protection for the ALJs' decisional independence, set forth above. The express prohibitions of performance evaluations and substantive review contained in 5 U.S.C. § 4301, and appellant's position description promulgated by the Bureau of Hearings and Appeals, give his injury the required direct impact upon statutorily created rights. These provisions, coupled with the direct, allegedly improper issuance of instructions to Nash and his fellow ALJs, make this "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant issuance of a declaratory judgment," if the allegations are true. *Lake Carriers' Association v. MacMullan*, 406 U.S. 498, 506, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972), *quoting Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941).

## IV.

Nash's remaining claims stand on a different footing. In contrast to the practices discussed above, the Employee Pool System has not been instituted at the Buffalo Field Office where appellant works. Nash's submissions to the court indicate that the plan is highly experimental and subject to ongoing revision, and his complaint alleges merely that "plans have been made for its being put into operation, wholly or partially" in his field office. Even accepting his statement as true, we cannot perceive an element of harm since the System's future effect upon Nash remains a matter of speculation. Judge Elfvin was correct in finding a lack of standing to assert this claim, since the amended complaint fails to allege the "immediate danger" required to sustain standing under *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1979). In challenging the titles and functions of

members of the Appeals Council and the Regional Chief ALJs, Nash again fails to allege any harm. He contests the Secretary's delegation of the power to hold hearings to non-ALJ Appeals Council members. But Director Trachtenberg avers that no member of the Appeals Council has ever tried a case in that capacity, and Nash does not dispute this. Similarly, even if the Regional Chief ALJs' administrative duties were found to be "inconsistent with their duties and responsibilities as hearing examiners," 5 U.S.C. § 3105, the resulting realignment of titles and responsibilities would not necessarily free appellant from the administrative "harassment" of which he complains. *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1972); *S. v. D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 793 (1973).

Finally, we reiterate that our discussion of Nash's standing to sue in no way reflects upon the merits of his claims. We merely note that premature dismissal for want of standing may deprive litigants of the "focused and careful decision on the merits to which they are clearly entitled." *Barlow v. Collins, supra*, 397 U.S. at 168, 90 S.Ct. at 839 (Brennan, J., dissenting). The current explosion of claims and appeals within the Social Security system has posed an awesome challenge to effective administration, and our holding is not intended to undermine the Bureau's good faith attempts to meet this challenge. By providing an authoritative delineation of the respective rights and powers of the parties to this litigation, and by recognizing that good administration must not encroach upon adjudicative independence, the district court on remand will have the opportunity to advance the principal goal of judicial and quasi-judicial administration: reduction of delay without compromise to the demands of

---

tled *Bono v. Social Security Administration*, C.A.No.77–0819–CV–W (W.D.Mo. settled June 19, 1979). The agreement states, in pertinent part, "OHA [the Bureau] will revise its transfer and training policies to eliminate any specific mention of production figures as criteria." At

present this court does not have before it a factual record sufficient to determine whether or not this stipulation moots the appellant's "quota system" claim. Appellees' mootness argument may be addressed to the district court on remand.

due process, of which judicial independence is but one, important part.