**James M.P. D'AMICO, et al.,
Plaintiffs-Appellants,**

v.

**Richard S. SCHWEIKER, et al.,
Defendants-Appellees.**

No. 82–2495.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 3, 1983.

Decided Feb. 3, 1983.

Rehearing and Rehearing En Banc
Denied March 22, 1983.

Thomas H. Ploss, Chicago, Ill., for plaintiffs-appellants.

Brian G. Kennedy, Civil Div., Dept. of Justice, Washington, D.C., for defendants-appellees.

Before POSNER and COFFEY, Circuit Judges, and NEAHER,* Senior District Judge.

POSNER, Circuit Judge.

The plaintiffs in this case, seven administrative law judges of the Social Security Administration, seek an injunction against an instruction that the Social Security Administration has issued to all of its administrative law judges. The district judge held that the plaintiffs had standing to bring such a suit but that the instruction was lawful, and so he dismissed the complaint on the merits. The administrative law judges appeal. The first and only question we consider is their standing to sue.

If you are receiving social security disability benefits, and cease to be disabled, you must repay any benefits you received after you ceased to be disabled—after "cessation," in bureaucratese. The Social Security Act does not tell the Social Security Administration how to determine when disability has ceased but it does authorize the Administration to prescribe by regulation "the criteria for determining when services performed or earnings derived from services demonstrate an individual's ability to engage in substantial gainful activity," 42 U.S.C. § 423(d)(4), and such a regulation has been promulgated, 20 C.F.R. § 404.1594.

The challenged instruction was issued by SSA's chief administrative law judge and concerns "retroactive cessation" (cessation prior to the sending of notice that benefits

* Of the Eastern District of New York.

are being terminated), which is what gives rise to the obligation to repay. The instruction announces that the Social Security Commissioner has adopted a "new policy" whereby the month of cessation will ordinarily be no earlier than the month in which the beneficiary receives notice that his benefits are being terminated—that is, there will be no retroactive cessation—except in specified circumstances, such as when "the cessation was based on work activity." Attached to the instruction is a notice that the administrative law judges are directed to send to the beneficiary in every pending case involving retroactive cessation in which a hearing has not yet been held. The notice informs the beneficiary of the new policy, recomputes the amount of benefits (if any) that the beneficiary will have to repay under the new policy if he loses his case, and provides a form on which he can "withdraw my request for a hearing on the termination of my disability benefits, because of the revision in the date on which my disability was found to have ceased." Presumably the idea behind the new policy is that many challenges to terminations of benefits are motivated by the beneficiary's unhappiness at being ordered to pay back benefits already received and spent, so that a more forgiving policy on repayment might cause many of those challenges to be abandoned.

Assuming—as we must to bring the question of standing into sharp focus—that the instruction and accompanying notice violate the Social Security Act, we must consider whether administrative law judges, to whom the instruction was addressed, have standing to bring a federal court suit to enjoin its enforcement.

Like anyone else, a judge has standing to complain of the usual sorts of injury, actual or threatened, for which courts provide a remedy. If the chief administrative law judge told these plaintiffs that he was reducing their salaries or fringe benefits they would have standing to sue just as the federal judges had standing to sue when Congress cancelled a pay raise for them in violation of Article III of the Constitution. See *Will v. United States,* 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980). And if he said that instead of reducing their pay or benefits he was increasing their hours, they might have standing to complain of this too, since an increase in hours worked is a reduction in hourly pay for people who are paid on an annual rather than hourly basis. No doubt some impairments of job amenities are so trivial that the maxim *de minimis non curat lex* would bar suit; reducing the temperature of the workplace to a level that was uncomfortable but not intolerable might be an example. But this does not affect the basic principle that reducing an administrative law judge's compensation does him a sufficient injury to confer standing to sue.

But the instruction in question did not reduce the pay or benefits of these administrative law judges or even the temperature in their offices, and if anything it will lighten their workload by inducing some recipients to accept the termination of their benefits without a contest. The instruction did, however, truncate the administrative law judges' adjudicative discretion. Previously the date of cessation had been a fact that the administrative law judge found by weighing the evidence. The instruction removed the date from the realm of fact by making it in the usual case no earlier than when the recipient was sent notice of termination, even though he must in fact have ceased being disabled earlier, since the government would not send a notice of termination until it had in hand evidence of cessation. Discretion is power, a commodity that judges, like other people, prize. A reduction in discretion is a reduction in an important though nonpecuniary form of compensation for a judge.

But the requirement of standing is more than just a screen to keep out cases so trivial that they are not worth the time of an Article III judge, or so inconsequential to one or both of the parties that they are unlikely to invest sufficient resources in its litigation to give the court all the information it needs for an intelligent decision. The concept has always served other poli-

cies as well, relating to the suitability of allowing particular disputes to be litigated. See 13 Wright, Miller & Cooper, Federal Practice and Procedure § 3531 at pp. 228–33 (1975). Maybe these policies are not of constitutional dimension, and are therefore reasons for exercising discretion not to entertain an unsuitable lawsuit for equitable relief rather than for denying standing. See *Riegle v. Federal Open Market Comm.*, 656 F.2d 873, 880–881 (D.C.Cir.1981). The distinction would matter in a case where no party had raised a "standing" issue, since the court would be obliged to consider the issue on its own initiative only if it affected the court's subject-matter jurisdiction, as considerations of equitable discretion would not. But the plaintiffs' right to sue was challenged here, so it does not matter what name we give the principle we are being asked to apply.

Although these administrative law judges have a big emotional stake in this case and have invested heavily of their time and money in its vigorous prosecution, they are the wrong people to be raising with us the question whether the challenged instruction is lawful. The instruction appears to favor the recipients of disability benefits, but the administrative law judges argue that in subtle ways it hurts the recipients. If so, we can expect one or more of them to challenge its lawfulness in a suit in federal district court under 42 U.S.C. § 405(g) to review the administrative denial of social security benefits. That route is preferable to a suit by administrative law judges, who are the umpires between claimants to social security benefits and the Social Security Administration. By becoming identified through participation in this lawsuit with one side of the controversies they are required to adjudicate, they lose the appearance and, judging from the tone of their briefs in this court, the reality of impartiality.

A footnote in *Board of Educ. v. Allen*, 392 U.S. 236, 241 n. 5, 88 S.Ct. 1923, 1925 n. 5, 20 L.Ed.2d 1060 (1968), states that members of a school board can challenge a state statute they believe to be unconstitutional. We need not consider whether this state-ment is authoritative in light of later Supreme Court decisions; *City of South Lake Tahoe v. California Tahoe Regional Planning Agency*, 625 F.2d 231, 237–38 (9th Cir. 1980), in a careful discussion, holds that it is not. The *Allen* case did not involve the danger to judicial impartiality that is created by allowing judicial officers to sue the government because they think they are being asked to enforce unlawful policies.

It makes no difference that the plaintiffs also allege that the "defendants have an ignoble history of punitive action against Administrative Law Judges, one of the present plaintiffs has already received adverse action following the institution of this action, and plaintiffs are in need of . . . protection . . . from any career harassment . . . ." All they mean is that their refusal to obey instructions may subject them to disciplinary action. Like other federal civil servants, administrative law judges can invoke an elaborate grievance machinery (see 5 U.S.C. § 7521)—one plaintiff says he has done so—and in the absence of any showing or even suggestion that this machinery is inadequate either in general or in the present circumstances, the principle of exhaustion of administrative remedies would prevent a court from circumventing the machinery and enjoining the defendants from taking disciplinary action against the plaintiffs. See *Blackmar v. United States*, 173 Ct.Cl. 1035, 354 F.2d 340, 346–47 (1965) (per curiam). But in any event this is not a suit to enjoin "career harassment"; it is a suit to enjoin the enforcement of the instruction, and if administrative law judges do not have standing to bring such a suit they cannot confer it on themselves, bootstrap fashion, by disobeying the instruction and then complaining that their disobedience laid them open to discipline. Their proper course is to obey the instruction and let any claimant injured by it ask the courts to set it aside.

All this would be clear enough were it not for *Nash v. Califano*, 613 F.2d 10 (2d Cir. 1980), which held that an administrative law judge of the Social Security Adminis-

tration had standing to sue to enjoin "an allegedly unauthorized regime of monitoring, evaluation and control" to which he had been subjected. *Id.* at 11. The specific allegations that the court held conferred standing involved "mandatory instructions concerning the proper length of hearings and opinions, the amount of evidence required in specific cases, and the proper use of expert witnesses"; the establishment of "an arbitrary monthly production quota" for administrative law judges; and an attempt "to control the number of decisions denying Social Security Benefits" by specifying 50 percent as the acceptable rate of reversal of administrative law judges' decisions and "counsel[ing] and admonish[ing] ... those who deviate from the mean ... " to bring their rates in line with" this figure. *Id.* at 13. The court held that the laws regulating the tenure of administrative law judges gave them "a qualified right of decisional independence," *id.* at 15, and that an impairment of that interest was an injury upon which a federal lawsuit could be founded.

*Nash,* whatever its merit as an original matter, is distinguishable from the present case—and not only because the "production quota" allegation could be interpreted as an attempt to reduce the administrative law judges' wages per hour by making them work harder for the same annual salary. The withdrawal, as in this case, of one issue from the factfinding power of the administrative law judges does not significantly impair "decisional independence." And the challenge, as in *Nash,* to housekeeping as distinct from substantive directives does not put the judicial officer who sues to enjoin it in the position of taking sides in controversies that he is supposed to adjudicate impartially. If the Administrative Office of the United States Courts told us not to reverse the district judges in this circuit in more than 10 percent of the cases appealed, and we sued the Administrative Office claiming that its directive was an impairment of our judicial independence, we could not be accused of suing as the champions of a particular class of litigants. We would be the champions of all appellants rather than, like the administrative law judges in this case, champions of a group defined by its members' substantive positions in litigation. We do not hold that we would have standing to bring such a case—only that if we did, it would not support the standing of the plaintiffs in this case.

The decision and judgment of the district court are vacated with directions to dismiss the complaint.

So ORDERED.