171 F.3d 1083
 133 Ed. Law Rep. 708
 PEOPLE WHO CARE, et al., Plaintiffs-Appellees,
v.
ROCKFORD BOARD OF EDUCATION, SCHOOL DISTRICT NO. 205,
Defendant-Appellant,
Theodore Biondo, Patricia Delugas, and David L. Strommer,
Intervenor-Appellants.
 Nos. 98-1056, 98-1105, 98-1231, 98-1449, 98-2452, 98-2488,
98-3340 and 98-3858.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 8, 1999.
Decided March 19, 1999.
 
 Nancy G. Lischer (argued), Thomas Lester (argued), Stephen R. Swoffard, Hinshaw & Culbertson, Chicago, IL, for Rockford Board of Education School District No. 205.
 Peter D. Debruyne, Debruyne, Yalen & Olsen, Rockford, IL, Peter Alexander, Rockford, IL, for Theodore Biondo, Patricia Delugas and David L. Strommer in docket No. 98-2452.
 Janet Pulliam, Little Rock, AR, David Faulkner, Amy E. Shappert, Lord, Bissell & Brook, Rockford, IL, for Special Master Dr. Eugene Eubanks, of Kansas City, MO.
 Before POSNER, Chief Judge, and BAUER and KANNE, Circuit Judges.
 POSNER, Chief Judge.
 
 
 1
 We have consolidated for decision eight appeals, seven by the Rockford, Illinois, board of education and the eighth by three members of the board who sought to intervene in the district court and were turned down. The board's appeals challenge budget orders by the magistrate judge who is presiding over the long-running Rockford public school desegregation case. None of the appeals has merit. A newly elected school board and its newly retained law firm are engaged in guerrilla warfare against the very provisions of a remedial decree to which their predecessors had consented, and are also drawing unwarranted inferences from our prior decision reported at 111 F.3d 528 (7th Cir.1997). In doing these things they are missing the proper route to the speedy termination of this litigation that is their rightful goal.
 
 
 2
 The suit began almost a decade ago, though litigation over racial segregation in Rockford's public school system has been going on for more than a quarter of a century. Five years ago, the district court found that the school district had, indeed, intentionally discriminated against black and Hispanic students, in violation of the equal protection clause of the Fourteenth Amendment. The board of education did not challenge that finding. And the parties consented to have a magistrate judge, aided by a special master, preside over the remedial phase of the litigation. In 1996, the magistrate judge entered an elaborate equitable decree, the "Comprehensive Remedial Order." Both parties appealed, each challenging several provisions of the decree; many of its provisions, however, neither party challenged. We invalidated several provisions, mainly those challenged by the school board. These were racial quotas for teachers and superseniority for minority teachers; classroom racial quotas; a four-year deadline to halve the gap in test scores between white and minority students; the purging of "subjective" considerations in the disciplining of students; limiting minority students' access to compensatory education in order to avoid creating unfavorable stereotypes; limiting the school district's access to its "tort immunity fund" as a source of funding compliance with the decree; prescribing the racial composition of cheerleading squads; and excluding prekindergarteners from the decree's protection.
 
 
 3
 We did not consider--we were not asked to consider--the financial implications of our decision. There might, of course, be some. For example, the magistrate judge might have ordered funding for purging subjective elements from student discipline or for trying to close half the achievement gap between white and minority students within four years. But this could not be assumed. Programs might have multiple objectives, and shearing away one of them might not call for a significant, or even any, reduction in its scope and expense. Some "programs," such as regulating the racial composition of the cheerleading squads, might not have required any funding, and so eliminating the program would not reduce the budget for compliance with the decree.
 
 
 4
 In the wake of our 1997 decision the master submitted to the magistrate judge proposed budgets for funding the Comprehensive Remedial Order in fiscal years 1998 and 1999. The school board complained that the budgets included funding for provisions of the decree that we had invalidated. The magistrate judge made a few cuts, but not as many as the board wanted. The board's appeals challenge the various budget orders that the magistrate judge entered for these two fiscal years.
 
 
 5
 The plaintiffs argue that we lack jurisdiction to consider these appeals because they are nonfinal orders that do not modify the Comprehensive Remedial Order. But equitable decrees that impose a continuing supervisory function on the court commonly and here contemplate the subsequent issuance of specific implementing injunctions. See, e.g., Missouri v. Jenkins, 515 U.S. 70, 74-80, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995); System Federation No. 91 v. Wright, 364 U.S. 642, 647, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961); Waste Management of Ohio, Inc. v. City of Dayton, 132 F.3d 1142, 1145-46 (6th Cir.1997); Donald L. Horowitz, "Decreeing Organizational Change: Judicial Supervision of Public institutions," 1983 Duke L.J. 1265, 1268. Each such injunction is appealable regardless of finality, whether it is considered a modification of the original decree or, as seems to us more realistic, a separate injunction, the decree being an injunction generator. The characterization makes no difference because both injunctions and orders modifying injunctions are appealable without regard to finality. 28 U.S.C. § 1292(a)(1).
 
 
 6
 It could hardly be otherwise. The Rockford Board of Education could not be expected, when it first appealed from the Comprehensive Remedial Order, to challenge budget orders not yet entered. And though in form orders to pay, the budget orders, as means of follow-on relief in an equitable proceeding, are in fact injunctive orders--what in Wisconsin Hospital Ass'n v. Reivitz, 820 F.2d 863, 868 (7th Cir.1987), we called "equitable supplement[s]" to an equitable decree. And anyway payment orders can be appealed without regard to finality when the appellant has no prospect of recovering the money should the order later be found to have been in error. See, e.g., Cleveland Hair Clinic, Inc. v. Puig, 104 F.3d 123, 126 (7th Cir.1997); Trustees of Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension Fund v. Central Transport, Inc., 935 F.2d 114, 116 (7th Cir.1991); Palmer v. City of Chicago, 806 F.2d 1316, 1319-20 (7th Cir.1986); I.A.M. National Pension Fund Benefit Plan A v. Cooper Industries, Inc., 789 F.2d 21 (D.C.Cir.1986). There is no way the plaintiffs can be made to repay millions of dollars to the taxpayers of Rockford should it turn out several years from now when this litigation is finally wound up that the budget orders are overgenerous.
 
 
 7
 So the board can challenge the 1998 and 1999 budget orders, and although fiscal year 1998 has ended, the challenge to the 1998 order is not moot. If the board "overpaid," it may be able to recoup out of the unexpended funds from that budget; indeed, one of the challenges to the 1999 budget order is that the amount ordered is excessive in light of the surplus in the 1998 budget.
 
 
 8
 So there is no jurisdictional bar to the board's appeals. But none of the board's challenges to the magistrate judge's budget rulings has merit. The board exaggerates the practical scope of judicial review of such rulings. Public school desegregation litigation, like other institutional reform litigation, is remote from the conventional Anglo-American model of litigation. This is especially true of the remedial phase, which often and in this case thrusts the federal courts into a managerial rather than adjudicative role. See Abram Chayes, "The Role of the Judge in Public Law Litigation," 89 Harv. L.Rev. 1281, 1298, 1302 (1976); Horowitz, supra, 1983 Duke L.J. at 1307; Lewis v. Casey, 518 U.S. 343, 385-88, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (concurring opinion); Missouri v. Jenkins, supra, 515 U.S. at 124-26, 115 S.Ct. 2038 (concurring opinion). We can decide which provisions of the remedial decree are valid and which invalid, but when it comes to the design of specific programs for achieving the objectives of the valid provisions, and to the funding for those programs, we have no practical alternative to deferring broadly to the judgment of the district court. Cf. Swann v. Board of Education, 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). There is very little law to apply (cf. 5 U.S.C. § 701(a)(2); Lincoln v. Vigil, 508 U.S. 182, 190-92, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993); Webster v. Doe, 486 U.S. 592, 599-600, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988); Bogard v. Wright, 159 F.3d 1060, 1064 (7th Cir.1998)) to such questions as whether programs designed to make school personnel more sensitive to cultural differences that are correlated with race or ethnicity are validly oriented toward desegregation or, rather, cross the fine line that separates the valid goal of eliminating discrimination and its specific, demonstrable effects from the invalid goal of seeking equality of test results, or other performance outcomes. The required determinations are quintessentially judgmental, cf. Avitia v. Metropolitan Club of Chicago, Inc., 49 F.3d 1219, 1225 (7th Cir.1995), and there is little that an appellate court can do to improve them, except in egregious cases, such as Missouri v. Jenkins, supra, which this one is not.
 
 
 9
 The board objects, for example, to the funding of "high school attendance specialists" on the ground that "attendance specialists do not differentiate between minority and majority students, because principals want all students in class," and anyway "there is no evidence that [the school district] discriminated against minorities by encouraging their truancy." But if minority attendance is lower as a consequence of past discrimination by the school district, as it might be even if the district never encouraged minority students to be truants, then expenditures designed to increase minority attendance might well be within the scope of the remedial decree. The board objects on similar grounds to the funding of "human relations specialists," and again overlooks the possibility that they are necessary to help integrate minority students into schools that used to exclude them, a proper object of the remedial decree. It is unnecessary to discuss the board's other objections to specific expenditure items in the budget orders; they are no more convincing, and often more picayune, and some are completely groundless, such as the charge that the budget is financing efforts to help minority parents obtain electricity.
 
 
 10
 It is notable that while claiming that the budgets approved by the magistrate judge are inflated by the cost of programs oriented toward the provisions of the decree that we invalidated in our 1997 decision, the board did not submit an alternative budget figure for either 1998 or 1999 from which the funding of the improper programs had been subtracted. That is, they never proposed, as an alternative to the plaintiffs' submissions, their own set of programs for achieving compliance with the remedial decree. They merely took pot shots at the plaintiffs' set. They repeat this approach in this court. They make a series of objections which, like the objection to the funding of attendance specialists, is difficult to assess because each program to which they object may or may not be primarily oriented toward invalidated provisions of the decree. They have not given us any crisp, quantitative sense of what their own preferred mode of compliance would look like.
 
 
 11
 The board also contends that the budget orders are marred by procedural irregularities, in particular the fact that the master engaged in ex parte communications with the plaintiff's lawyers. This is an example of trying to change litigating positions in midstream without any justification rooted in changed circumstances, and hence in the teeth of the law of the case doctrine. Carr v. O'Leary, 167 F.3d 1124, 1125-26 (7th Cir.1999); see also Agostini v. Felton, 521 U.S. 203, 236, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); Bethesda Lutheran Homes & Services, Inc. v. Leean, 154 F.3d 716, 719 (7th Cir.1998); Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic, 152 F.3d 588, 591 (7th Cir.1998); Schering Corp. v. Illinois Antibiotics Co., 89 F.3d 357 (7th Cir.1996); Crocker v. Piedmont Aviation, Inc., 49 F.3d 735, 739 (D.C.Cir.1995). A series of orders to which the school board did not object and which were incorporated into a provision of the Comprehensive Remedial Order that the board did not appeal from authorize the master to meet or otherwise communicate with lawyers for the parties, with district staff, with the magistrate judge, and with other interested persons without the presence of lawyers from the other side. The reason is practical, and is connected once again with the managerial character of institutional reform litigation in the remedial phase. The master is not a judge, and the judicializing of his role would slow him down and thus further protract this litigation, already in its tenth year. You do not put together a proposed budget by having lawyers make adversary presentations on each line item. And you do not request such a procedure if you want to minimize cost and time, which the board claims to want to do. But the important point is that the board agreed to this informality, and cannot retract its agreement. It also agreed to the master's having his own counsel.
 
 
 12
 The board argues that the master has demonstrated his bias by meeting more often with the plaintiffs' lawyers than with the school board's. This is an absurd argument. The master met constantly with the board's general counsel until the new board fired him and its new lawyers decided they would refuse to meet with the master ex parte in order to lay a foundation for the argument of bias that they now press on us. In its reply brief in this court, the board argues for the first time--and much too late--that the magistrate judge is biased against the board and that we should take the case away from him. In light of such arguments, if the magistrate judge is exasperated by the board's tactics (of which there is, however, no evidence), he can hardly be blamed.
 
 
 13
 We have referred to the "new board," and its newness is the essential background not only to the board's appeals but also to the appeal of the three would-be intervenors. They were elected to the school board on a platform of opposition to funding compliance with the Comprehensive Remedial Decree out of the school district tort immunity fund. They duly voted against a levy, deadlocking the board, which at the time had only six members. (Since then, they have obtained a majority.) The magistrate judge ordered the board to approve the levy and gave the members until a specific date to carry out their duty in this regard, that is, to vote for the levy. All the members then voted for it. The members who want to intervene complain that by ordering them to vote against their consciences, the magistrate judge "injured Biondo [and the other two would-be intervenors] in his individual capacity by turning him into another dissembling politician in the minds of his constituents in reversing (under court compulsion) his position on the tort taxes." They argue that this injury is sufficient to confer standing to challenge the magistrate judge's order. They also argue that the magistrate judge did not have jurisdiction to rule on their motion to intervene because, unlike the parties, they had not consented to have the case heard, and a dispositive order (as distinct from a mere recommendation) entered, by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1).
 
 
 14
 We disagree with both arguments, and let us take up the second first. Although the power of a magistrate judge to enter binding judgments depends on the consent of the parties, it would erode that power unduly if would-be intervenors had to consent as well. If the motion to intervene were submitted to and granted by a district judge, the intervenors would become parties, and the case could not proceed to judgment by the magistrate judge without their consent. Williams v. General Electric Capital Auto Lease, Inc., 159 F.3d 266 (7th Cir.1998); Brook, Weiner, Sered, Kreger & Weinberg v. Coreq, Inc., 53 F.3d 851, 852 (7th Cir.1995). They made clear to us at argument that they would not consent, and so the entire case, or at least the parts of it on which their claims bore, would be shifted to a different adjudicator. The consequences would be delay, confusion, duplication of effort, the possibility of inconsistent determinations, and a drain on judicial resources. Some of these consequences would ensue even if the district judge denied the motion to intervene. For to rule on the motion he would have to familiarize himself with a case pending before another adjudicator, and the case would be frozen, as a practical matter, while he was mulling over his ruling.
 
 
 15
 We conclude that the power to rule on motions to intervene is a necessary and proper incident of the magistrate judge's power to decide the underlying case. This conclusion does no violence to the language of § 636(c)(1), which requires only the consent of "parties" to the magistrate judge's entering dispositive orders; an applicant for intervention is not a party, Atlantic Mutual Ins. Co. v. Northwest Airlines, Inc., 24 F.3d 958, 960 (7th Cir.1994); cf. Williams v. General Electric Capital Auto Lease, Inc., supra, 159 F.3d at 269--he wants to become a party. He is a litigant, and if there were a good reason to classify him as a party the language of the statute would certainly bend far enough to allow this. But the good reasons are on the other side.
 
 
 16
 So the magistrate judge was empowered to rule on the motion to intervene; and he was right to deny it. An order to do something in one's official capacity does not create the kind of injury that can support a suit in federal court consistent with Article III's limitation of the judicial power of the United States to cases or controversies, and we require a showing of such an injury by all intervenors. Planned Parenthood of Wisconsin v. Doyle, 162 F.3d 463, 465 (7th Cir.1998); Solid Waste Agency v. U.S. Army Corps of Engineers, 101 F.3d 503, 507 (7th Cir.1996). Suppose an appellate court orders a trial judge to dismiss a suit. Could the judge seek judicial relief against the order on the ground that the appellate court had "injured" him by making him do something that he didn't want to do? The answer is "no," D'Amico v. Schweiker, 698 F.2d 903 (7th Cir.1983); Nash v. Bowen, 869 F.2d 675, 677-78 (2d Cir.1989), and it is equally applicable to a challenge by a member of an agency who is ordered to do something in his official capacity. The magistrate judge's order ran in the first instance against the school board, the board members being mentioned in the order only to make sure that the board complied. This was the proper way of structuring the order. Spallone v. United States, 493 U.S. 265, 280, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990). Had the order named only the board members, or if, as in Spallone, it had sought to impose sanctions on them, they would be the proper appellants. In the first situation they would be the board, and in the second they would be facing tangible harm. We have neither situation here.
 
 
 17
 Allowing a judge to seek judicial relief against the order of a higher court would have very peculiar consequences. Suppose that, as in our earlier example, the appellate court ordered the trial judge to dismiss the case, and the plaintiff accepted the decision but the judge did not, and the judge appealed to a still higher court, which reversed and reinstated the case. Who would litigate it? The plaintiff, who had abandoned the case? The judge? This case is similar. The board did not appeal the order that it pay for compliance with the remedial decree out of the tax immunity fund. If the members of the board who are unhappy with the order are able to intervene, and they succeed in getting the order reversed, and the matter is remanded to the magistrate judge for further proceedings, who will prosecute the further proceedings? The board that had decided not to challenge the order? Or the rump of the board that had succeeded in getting the order overthrown?
 
 
 18
 The board has standing to challenge the district court's budget orders, of course. United States v. Board of School Commissioners, 128 F.3d 507, 511 (7th Cir.1997). The board is an institution, with legal capacity to sue and be sued, that is being ordered to spend millions of dollars in ways that it does not like. The issue is whether members of the board can also challenge the court's orders, even though the members are not being ordered to pay out of their own pocket or do anything else that would infringe their liberty or property as distinct from their official powers. To allow them to intervene would be as anomalous as allowing a corporate officer to intervene in a suit against the corporation.
 
 
 19
 The effort at intervention in this case is misguided to the point of being preposterous, since the would-be intervenors are not a minority of the board, but are part of the majority. The only effect of allowing them into the case would be to slow it down, which is the opposite of what the board wants or should want. United States v. City of Chicago, 870 F.2d 1256, 1259 (7th Cir.1989).
 
 
 20
 Speaking of slowing this litigation down, we expressed concern both in our 1997 decision and in a more recent procedural decision, consolidating a number of the board's appeals, 153 F.3d 834 (7th Cir.1998) (per curiam), with the looming interminability of this litigation. We pointed out that the Supreme Court has repeatedly in recent years emphasized the importance of moving institutional reform litigation in general and school desegregation litigation in particular toward early termination, enabling the devolution of control over core state and local functions from unelected federal judges to democratically legitimate state and local authorities. We hoped that our 1997 decision, in cutting back the scope of the comprehensive remedial decree, would set the stage for an early termination. We had thought it would be followed by the school board's submitting a plan for winding up the litigation within a definite and short period of time. Instead we are being inundated by groundless appeals challenging peripheral and for the most part unexceptionable facets of the magistrate judge's administration of the remedial decree.
 
 
 21
 The board told us at argument that it thinks full compliance with the decree is achievable by 2002; and when full compliance is achieved, the decree must be dissolved. Board of Education v. Dowell, 498 U.S. 237, 246-50, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991); Bogard v. Wright, supra, 159 F.3d at 1065; United States v. Board of School Commissioners, supra, 128 F.3d at 511-12. As we explained in our previous opinion, compliance does not mean eliminating every disparity between white and minority achievement or performance that might conceivably be attributed to past discrimination. 111 F.3d at 534; see also Missouri v. Jenkins, supra, 515 U.S. at 89, 115 S.Ct. 2038; Freeman v. Pitts, 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992); Board of Education v. Dowell, supra; United States v. Board of School Commissioners, supra, 128 F.3d at 510-12. Full compliance so defined would never be achieved. The school district of a modest-sized city is being required to pay in excess of $20 million a year to fund the decree. That's more than $120 million between 1996 and 2002. That's an awful lot of compliance, and it is not purchased cheaply; legal fees in the litigation already exceed $20 million. Expenditures beyond the $120 million figure might be difficult to justify as being needed to pay for programs realistically designed just to remedy the lingering effects of racial and ethnic discrimination now years in the past, which is the only legitimate function of the remedial decree. The logical next step, therefore, is for the board to propose to the magistrate judge, after consultation with the plaintiffs and the master, a modification of the decree that will include an appropriate termination date (perhaps a series of different dates, for different programs) contingent on the achievement of specific targets demonstrating a reasonable approximation to full compliance by then. Cf. Freeman v. Pitts, supra, 503 U.S. at 489-92, 112 S.Ct. 1430; United States v. Board of School Commissioners, supra, 128 F.3d at 510-12. The board will get nowhere with its present litigating strategy. Persistence in it will merely invite the imposition of sanctions for prosecuting frivolous appeals.
 
 
 22
 AFFIRMED.