869 F.2d 675
 25 Soc.Sec.Rep.Ser. 97, Unempl.Ins.Rep. CCH 14544A
Simon NASH, Plaintiff-Appellant,
v.
Otis R. BOWEN, John A. Svahn, Donald J. Devine, Louis B.
Hays, Philip T. Brown, and L. Charles Leonard,
Defendants-Appellees.
 No. 586, Docket 88-6066.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 20, 1988.
Decided March 7, 1989.
 
 Simon Nash, Buffalo, N.Y., plaintiff-appellant pro se.
 Stephen J. Markman, Ass't. Atty. Gen., Washington, D.C. (Wilfred R. Caron, Sr. Counsel, William G. Laffer III, Office of Legal Policy, U.S. Dep't of Justice, Washington, D.C., of counsel), for defendants-appellees.
 Irving Kator, Joseph B. Scott, Jennifer R. Levin, Kator, Scott & Heller, Washington, D.C., for Federal Administrative Law Judges Conference and Ass'n of Administrative Law Judges, amici curiae, on behalf of plaintiff-appellant.
 Anthony Szczygiel, Ass't Professor, Legal Assistance Program, State University of New York at Buffalo Law School, Buffalo, N.Y., amicus curiae, on behalf of plaintiff-appellant.
 Before FEINBERG, NEWMAN and ALTIMARI, Circuit Judges.
 ALTIMARI, Circuit Judge:
 
 
 1
 The principal issue raised by the instant appeal following a nonjury trial in the United States District Court for the Western District of New York (Elfvin, J.) is whether efforts by the Secretary of Health and Human Services (the "Secretary") to improve the quality and efficiency of the work of Administrative Law Judges ("ALJs") impaired their asserted right to "decisional independence" under the Administrative Procedure Act, 5 U.S.C. Sec. 551 et seq. (the "APA"). In addition, we are asked to decide whether plaintiff-appellant, an ALJ with the Social Security Administration, has standing to challenge the Secretary's policy of non-acquiescence in decisions of federal courts other than the Supreme Court. Because the district court's factual findings underlying the conclusion that the Secretary's policies did not exceed the bounds of legitimate agency supervision are fairly supported by the record and therefore are not clearly erroneous, we agree with the district court that the Secretary's practices did not infringe on the decisional independence of ALJs. We also find that the district court correctly granted summary judgment in favor of defendants-appellees on plaintiff-appellant's non-acquiescence claim for lack of standing and therefore affirm the district court's judgment in all respects.
 
 BACKGROUND
 
 2
 Plaintiff-appellant, pro se, Simon Nash is an Administrative Law Judge ("ALJ") with some thirty years experience in the Social Security Administration. In 1967, he became an ALJ in charge ("ALJIC") of the Buffalo, New York field office of hearings and appeals. By 1975, the Social Security Administration (the "agency") was faced with an administrative crisis due to a backlog of over 100,000 cases. In order to eliminate the backlog and the concomitant delays in processing appeals, former director of the Bureau (now "Office") of Hearings and Appeals Robert L. Trachtenberg instituted a series of reforms which appellant contends interfered with the "decisional independence" of ALJs under the APA, the Social Security Act and the due process clause of the fifth amendment. Nash initially protested the new policies within the agency only to be summarily demoted from his position as ALJIC to ALJ. In his original complaint filed May 30, 1978 in the district court, plaintiff alleged, in addition to a claim concerning his demotion which was later dropped, that the Secretary's newly-instituted "Peer Review Program," monthly production goals, and "Quality Assurance System" infringed upon the "quasi-judicial" status of ALJs. Nash v. Califano, 613 F.2d 10, 13 (2d Cir.1980) ("Nash I "); see Ramspeck v. Federal Trial Examiners Conference, 345 U.S. 128, 130, 73 S.Ct. 570, 572, 97 L.Ed. 872 (1953).
 
 
 3
 On June 4, 1979, plaintiff's claims were dismissed by the district court for lack of standing. This court reversed on January 7, 1980 in an opinion by then Chief Judge Kaufman, Nash I, 613 F.2d 10, and remanded the case to the district court for further consideration. We held that the "alleged inroads on ALJs' decisional independence [was] arguably within the zone of interests protected by the [APA] and Social Security Act." Id. at 14; see Association of Data Processing Serv. Organizations, Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). This court also noted in dicta that the APA confers a "special status" on ALJs, protecting them from agency interference and giving them a "qualified right" of decisional independence. 613 F.2d at 15-16; see Ramspeck, 345 U.S. at 132-33, 73 S.Ct. at 573.
 
 
 4
 Following remand to the district court, plaintiff filed an amended complaint, dated September 29, 1982, which realleged the above claims seeking declaratory relief and added a new claim which attacked the legality of the agency's non-acquiescence policy. On May 29, 1985, the district court dismissed plaintiff's non-acquiescence claim for lack of standing and set the remaining claims for trial. At that time, the district court also considered defendants' contention that this court's decision in Nash I--while resolving the question of plaintiff's standing to maintain his remaining claims under the APA--did not preclude dismissal of those claims inasmuch as neither the APA nor any other federal statute expressly or impliedly creates a private right of action in plaintiff's favor. The district court rejected this argument and instead interpreted Nash I as construing the APA to provide plaintiff a right of action to advance his decisional independence claims. But see Goodman v. Svahn, 614 F.Supp. 726, 729 n. 3 (D.D.C.1985); cf. Association of ALJs, Inc. v. Heckler, 594 F.Supp. 1132, 1140-41 (D.D.C.1984). The case thus proceeded to trial before Judge Elfvin in 1985-86, and following trial the matter was submitted for decision. On January 6, 1988, the district court filed its memorandum decision and order finding in favor of defendants, and judgment thereafter was entered dismissing all of plaintiff's claims.
 
 DISCUSSION
 I.
 
 5
 We address plaintiff's non-acquiescence claim first. As the district court correctly recognized, plaintiff was unable to demonstrate the requisite " 'distinct and palpable' " injury, Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) (quoting Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)), arising from the challenged practice such that he "personally would benefit in a tangible way from the court's intervention." Warth, 422 U.S. at 508, 95 S.Ct. at 2210; see Allen v. Wright, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). The only adverse consequence for Nash resulting from nonacquiescence is that his decisions are subject to reversal by the Secretary. This court previously has considered the Secretary's de facto policy of non-acquiescence in the law of the circuit concerning the "treating physician" rule, but only in the context of adjudicating the rights of claimants to Social Security benefits. See, e.g., Stieberger v. Bowen, 801 F.2d 29 (2d Cir.1986); Schisler v. Heckler, 787 F.2d 76 (2d Cir.1986). At least one other circuit court has rejected ALJ standing to challenge the merits of a policy instruction to ALJs when a claimant-initiated proceeding seeking review of the administrative denial of social security benefits is available. See D'Amico v. Schweiker, 698 F.2d 903, 906 (7th Cir.1983). Indeed, "[t]hat route is preferable to a suit by administrative law judges, who are the umpires between claimants to social security benefits and the Social Security Administration." Id. We thus agree with the district court that Nash lacks standing to pursue a non-acquiescence claim against the Secretary.
 
 II.
 
 6
 Turning, then, to plaintiff's "decisional independence" claims, the challenged practices are threefold. As explained in Nash I, familiarity with which is assumed, the first allegedly unlawful practice is the "Peer Review Program" (a/k/a the "Appellate Appraisal System,") which directed the Office of Hearings and Appeals to review decisions of ALJs outside of the usual appeals procedure conducted by the Appeals Council. 42 U.S.C. Secs. 405, 421; 20 C.F.R. Sec. 404.900 et seq.; cf. 5 U.S.C. Secs. 556(b)(3), 3105 (vesting ALJs with power to conduct administrative hearings). The second practice concerns the imposition of allegedly arbitrary monthly production quotas requiring ALJs to render a specified number of decisions per month. Cf. 5 U.S.C. Sec. 4301(2)(D) (exempting ALJs from performance appraisals); 5 C.F.R. Sec. 930.211 (same). The third alleged threat to ALJs' decisional independence is the "Quality Assurance System," which attempted to control the number of ALJ decisions reversing previous state-level determinations declining to award benefits. See generally Nash I, 613 F.2d at 13.
 
 A.
 
 7
 Preliminarily, we address two procedural arguments raised by defendants on this appeal. According to defendants, plaintiff's generalized attacks on the agency are "fundamental[ly] flaw[ed]" in that they do not state a cause of action under the APA or any other federal statute. Defendants point to the D.C. Circuit's in banc decision in Council of and for the Blind of Delaware County Valley, Inc. v. Regan, 709 F.2d 1521, 1524-25 (D.C.Cir.1983) as support for the proposition that although we previously have decided in favor of plaintiff on the question of standing, Nash I, 613 F.2d at 16-17, this court is not thereby precluded now from holding that plaintiff has no private right of action to maintain his suit. Cf. Goodman v. Svahn, 614 F.Supp. 726, 729 n. 3 (D.D.C.1985). Relying on dicta from Nash I that the APA "confer[s] a qualified right of decisional independence upon ALJs," 613 F.2d at 15, the district court declined to examine the sufficiency of Nash's claims and proceeded directly to the merits. Defendants in effect argue that the district court was not bound by dicta in Nash I and should have dismissed plaintiff's causes of action for failure to state claims upon which relief could be granted. See Fed.R.Civ.P. 12(b)(6).
 
 
 8
 While we agree Nash I stands only for the narrow premise that plaintiff has standing to pursue his claims, we see no need to decide in this case whether the APA confers, expressly or by implication, protection for the decisional independence of ALJs since the district court rejected Nash's claims on their merits. We should add, however, that it is not clear whether the APA provides such protection aside from the tenure, compensation, and performance appraisal exemption provisions under the APA that give life to the "quasi-judicial" status of ALJs. See Goodman, 614 F.Supp. at 728; cf. 5 U.S.C. Sec. 7521(a) (protecting ALJs from agency disciplinary action except for "good cause established and determined by the Merit Systems Protection Board ... after opportunity for hearing before the Board"); id. Sec. 1205(a)(1) (empowering Merit Systems Protection Board to hear and adjudicate disputes under APA, including whether an ALJ has been subjected to "prohibited personnel practice" under 5 U.S.C. Sec. 1206(a)(1)); Brennan v. HHS, 787 F.2d 1559 (Fed.Cir.), cert. denied, 479 U.S. 985, 107 S.Ct. 573, 93 L.Ed.2d 577 (1986) (adjudicating ALJ decisional independence claim in context of appeal from decision of Merit Systems Protection Board disciplining ALJ under 5 U.S.C. Sec. 7521). In any event, given the present posture of this case, we decline to assess the legal sufficiency of Nash's claims.
 
 
 9
 Defendants' other procedural objection concerns the preclusive effect of a prior judgment in favor of the Secretary in Association of ALJs v. Heckler, 594 F.Supp. 1132 (D.D.C.1984). The Department of Justice contends that the Association case is res judicata on the merits of at least two of Nash's decisional independence claims. The complaint in the Association case constituted a broad challenge to various practices of the Secretary substantially identical to those advanced by plaintiff in this case. The Association specifically alleged that the Secretary had infringed upon the decisional independence of ALJs through policies and practices designed to monitor the decisions of ALJs and "pressure [them] into disposing of ... larger numbers of cases each year" and "into deciding fewer cases in favor of claimants." Complaint p 18; see 594 F.Supp. at 1135-36. The record in this case indicates that Nash is a member of the Association, that he consulted with the Association's counsel about the D.C. district court litigation, and that he shared certain documents with the Association for use in its case. App. at 437-39.
 
 
 10
 We are inclined, therefore, to agree with defendants that the decision of the district court, at least with regard to the "Peer Review Program" and the "Quality Assurance System," may be affirmed as res judicata on the judgment in Association of ALJs v. Heckler. Although the district court did not rule on this point, it would seem that we are not precluded from doing so. See American Furniture Co. v. International Accommodations Supply, 721 F.2d 478, 482 (5th Cir. Unit A 1981); Robertson v. Interstate Securities Co., 435 F.2d 784, 787 n. 4 (8th Cir.1971); see also Dandridge v. Williams, 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156-57 n. 6, 25 L.Ed.2d 491 (1970); but cf. Savings & Profit Sharing Fund of Sears Employees v. Gago, 717 F.2d 1038, 1039 n. 3 (7th Cir.1983) (unless pleaded or otherwise properly raised at trial, res judicata defense is waived); Nevada Power Co. v. Watt, 711 F.2d 913, 932-33 (10th Cir.1983) (same).
 
 
 11
 On the question of res judicata, plaintiff argues only that his claims are separate and distinct from those decided in Association of ALJs. He attempts to couch the decisional independence claims raised by the Association case in terms of the now-discontinued "Bellmon Review Program," which was instituted under the authority of section 304(g) (the "Bellmon Amendment") of the Social Security Disability Amendments Act of 1980, Pub.L. No. 96-265, 94 Stat. 441, 456 (1980). See Association of ALJs, 594 F.Supp. at 1133; see also W.C. v. Bowen, 807 F.2d 1502, 1503-05 (9th Cir.1987) (explaining reasons for demise of "Bellmon Review Program"), modified, 819 F.2d 237 (9th Cir.1987). However, the fact that the "Bellmon Review Program" is no longer in existence does not make the legal issue moot. See Association of ALJs, 594 F.Supp. at 1141. Indeed, the challenged practices in this case also appear to have ceased; but because they are "capable of repetition, yet evading review," Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911), there remains a live controversy between the parties to be resolved. See Murphy v. Hunt, 455 U.S. 478, 481, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982). The point is that the "Bellmon Review Program" is for all intents and purposes the same as the "Quality Assurance System" considered herein, i.e., the targeting and pressuring of ALJs with high allowance of benefit rates (a/k/a "reversal" rates) to fall into line or be subjected to disciplinary action. Plaintiff's other claims were either raised in the Association case ("Peer Review Program" claim), or could have been raised (monthly production goals claim) in that action. See Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 414-15, 66 L.Ed.2d 308 (1980). In sum, Nash appears to have had a full and fair opportunity to be heard in that case.
 
 
 12
 Notwithstanding the very substantial, if not dispositive, arguments in favor of application of the rule of res judicata in the instant case, we nonetheless feel obliged to reach the merits of Nash's claims in view of our strong intimation in Nash I that plaintiff was entitled to a plenary trial. 613 F.2d at 17. Accordingly, we proceed to a consideration of the dismissal by the district court of plaintiff's decisional independence claims on their merits.
 
 B.
 
 13
 The district court explicitly determined that "[a]lthough the defendants may have engaged in some questionable practices which clearly caused great unrest among ALJs, ... they did not infringe on the decisional independence of ALJs." The factual components of this conclusion, as with all findings of fact, cannot be set aside on appeal unless they are clearly erroneous. Fed.R.Civ.P. 52(a).
 
 
 14
 The district court held that the "Peer Review Program" was intended to respond to the "wide disparity in legal and factual determinations among ALJs." Judge Elfvin concluded that various peer review actions constituted "legitimate administrative steps undertaken to enhance the quality and efficiency of the hearing system." Cf. Heckler v. Campbell, 461 U.S. 458, 466-67, 103 S.Ct. 1952, 1956-57, 76 L.Ed.2d 66 (1983). Policies designed to insure a reasonable degree of uniformity among ALJ decisions are not only within the bounds of legitimate agency supervision but are to be encouraged. See Santise v. Schweiker, 676 F.2d 925, 930-31 (3d Cir.1982), cert. denied, 461 U.S. 911, 103 S.Ct. 1889, 77 L.Ed.2d 280 (1983); see generally Scalia, The ALJ Fiasco--A Reprise, 47 U.Chi.L.Rev. 57 (1979). In this case, "extra-appellate" review of "dead" cases aimed at improving the quality of ALJ decisionmaking is entirely consistent with the prerogative of the agency which retains "all the powers which it would have in making the initial decision." 5 U.S.C. Sec. 557(b). It is, after all, the Secretary who ultimately is authorized to make final decisions in benefit cases. Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir.1984); cf. 42 U.S.C. Sec. 405(1) (authorizing Secretary to delegate his statutory powers to "any member, officer, or employee" of the agency). An ALJ is a creature of statute and, as such, is subordinate to the Secretary in matters of policy and interpretation of law. Mullen v. Bowen, 800 F.2d 535, 540-41 n. 5 (6th Cir.1986); Association of ALJs, 594 F.Supp. at 1141. Thus, the Secretary's efforts through peer review to ensure that ALJ decisions conformed with his interpretation of relevant law and policy were permissible so long as such efforts did not directly interfere with "live" decisions (unless in accordance with the usual administrative review performed by the Appeals Council). See 5 U.S.C. Sec. 556(b) (administrative hearings "shall be conducted in an impartial manner"); id. Sec. 554(d)(2) (ALJ shall not be "subject to ... supervision or direction" concerning pending matters). The efforts complained of in this case for promoting quality and efficiency do not infringe upon ALJs' decisional independence. Since Judge Elfvin concluded that the "Peer Review Program" was intended to be, and operated as, a quality control measure, we see no reason to disturb his determination.
 
 
 15
 Regarding the Secretary's policy of setting a minimum number of dispositions an ALJ must decide in a month, we agree with the district court that reasonable efforts to increase the production levels of ALJs are not an infringement of decisional independence. In a memorandum dated July 1, 1975, then Director Trachtenberg indicated that while he was opposed to the fixing of quotas, he was recommending a goal of 26 dispositions per four-week period. When Louis B. Hays became Associate Commissioner of the Office of Hearings and Appeals in 1981, he specifically concerned himself with ALJs whose productivity fell below twenty case dispositions per month. The record also reflects continuing pressure from the agency on ALJs to increase monthly dispositions.
 
 
 16
 The setting of reasonable production goals, as opposed to fixed quotas, is not in itself a violation of the APA. The district court explicitly found that the numbers at issue constituted reasonable goals as opposed to unreasonable quotas. Judge Elfvin explained that
 
 
 17
 [a] minimum number of dispositions an ALJ must decide in a given period, provided this number is reasonable and not "etched in stone", is not a prescription of how, or how quickly, an ALJ should decide a particular case. It does not dictate the content of the decision.
 
 
 18
 Moreover, in view of the significant backlog of cases, it was not unreasonable to expect ALJs to perform at minimally acceptable levels of efficiency. Simple fairness to claimants awaiting benefits required no less. Accordingly, we agree with the district court that the decisional independence of ALJs was not in any way usurped by the Secretary's setting of monthly production goals.
 
 
 19
 The Secretary's "reversal" rate policy embodied in the "Quality Assurance System," however, is cause for concern. To coerce ALJs into lowering reversal rates--that is, into deciding more cases against claimants--would, if shown, constitute in the district court's words "a clear infringement of decisional independence." See also Schweiker v. McClure, 456 U.S. 188, 195, 102 S.Ct. 1665, 1669-70, 72 L.Ed.2d 1 (1982). In his brief on appeal and at oral argument, Nash characterized the alleged pressure from the agency concerning reversal rates as the heart of the controversy. Plaintiff also maintained that the reversal rate policy, in effect from approximately 1975 to 1985, was implemented under the guise of improving the quality and uniformity of ALJ decisions but was in fact a clear attempt by the Secretary to influence ALJs into deciding more cases in favor of the agency.
 
 
 20
 The Secretary concedes that he was very concerned about reversal rates, but only to the extent that they might indicate errors in the decisionmaking of ALJs. Testimony in the record revealed that reversal rates were used as a benchmark in deciding whether there might be problems in the adjudicatory methods of particularly high (or low) reversal rate ALJs. Statistical record evidence supported the agency's proffered correlation between actual errors of law or policy in ALJs decisions and extremes in their reversal rates. The agency maintained then, and maintains now, that reducing reversal rates was not the intent of the policy. Indeed, a handwritten notation by Associate Commissioner Hays on a 1982 internal agency memorandum placed the policy in perspective:
 
 
 21
 [T]here is no goal to reduce reversal rates--there is a goal to improve decisional quality [and] consistency, which is assumed to have as one effect a reduction of the reversal rate.
 
 
 22
 App. at 2071.
 
 
 23
 In view of the foregoing record evidence, therefore, we cannot say that the district court's determination was clearly erroneous. Whatever legitimate concerns there may be about the soundness of the Secretary's practices regarding "reversal" rates, those concerns are more appropriately addressed by Congress or by courts through the usual channels of judicial review in Social Security cases. See generally Redish & Marshall, Adjudicatory Independence and the Values of Procedural Due Process, 95 Yale L.J. 455, 499-500 (1986). The bottom line in this case is that it was entirely within the Secretary's discretion to adopt reasonable administrative measures in order to improve the decisionmaking process. See Heckler v. Campbell, 461 U.S. 458, 466, 103 S.Ct. 1952, 1956-57, 76 L.Ed.2d 66 (1983) (" 'exceptionally broad' " authority is vested by Congress in Secretary to implement and administer Social Security Act) (quoting Schweiker v. Gray Panthers, 453 U.S. 34, 43, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981)); see also 42 U.S.C. Sec. 405(a), (b). Since the district court found no direct pressure on ALJs to maintain a fixed percentage of reversals, we conclude that the Secretary's policy in this regard did not infringe upon the "decisional independence" of ALJs.
 
 CONCLUSION
 
 24
 For all of the foregoing reasons, the judgment of the district court is
 
 
 25
 AFFIRMED.