McKAY, Circuit Judge,
dissenting
Notwithstanding the majority’s protestations otherwise, today’s opinion carries repercussions that will throw out of balance the teeter-totter approach to determining which of all the federal officials are subject to the Appointments Clause. While the Supreme Court perhaps opened the door to such an approach in Freytag v. Commissioner, 501 U.S. 868, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991), I would not throw it open any further, but in my view that is exactly what the majority lias done. I do not believe Freytag mandates the result proposed here, and the probable consequences are too troublesome to risk without a clear mandate from the Supreme Court. I respectfully dissent.
The majority compares SEC ALJs to the Tax Court’s special trial judges, and it reasons that because the duties of an ALJ are enough like those of a special trial judge, ALJs must be “Officers” too. But the similarities' between Freytag and this case matter far less than the differences. Most importantly, the special trial judges at issue in Freytag had the sovereign power to bind the Government and third parties:-SEC ALJs do not. And under the Appointments Clause, that difference makes all the difference. See Officers of the United States Within the Meaning of the Appointments Clause, 31 Op. O.L.C. 73, 73-74 (2007); Raymond J. Lucia Companies v. SEC, 832 F.3d 277, 285-87 (D.C. Cir. 2016).
The requirements of the Appointments Clause are “designed to preserve political accountability relative to important Government assignments.” Edmond v. United States, 520 U.S. 651, 663, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997). It ensures that members of the executive branch cannot “escape responsibility” for significant decisions by hiding behind unappointed officials or otherwise “pretending that” those decisions “are not [their] own.” Free Enter. Fund v. Public Co. Accounting Oversight Bd., 561 U.S. 477, 497, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010). Such government officials—“those who exercise the power of the United States”—must be “accountable to the President, who himself is accountable to the people.” Dep’t of Transp. v. Ass’n of Am. R.Rs., — U.S. —, 135 S.Ct. 1225, 1238, 191 L.Ed.2d 153 (2015) (Alito, J., concurring).
It is not surprising, then, that the Tax Court’s special trial judges were held to be officers in Freytag. 501 U.S. at 881-82, 111 S.Ct. 2631. It is clear from the context, if not the Freytag opinion, that these special trial judges had been delegated significant authority—much more authority than SEC ALJs. In some cases, special trial judges could enter final decisions on behalf of the Tax Court. Freytag, 501 U.S. at 882, 111 S.Ct. 2631. In those cases, it was conceded in Freytag that the special trial judges acted as inferior officers. Id. But even where special trial judges could not enter final decisions, them initial decisions had binding effect.
Where the special trial judges did not issue a final decision, the Tax Court was still required to presume correct the special trial judge’s factual findings, including findings of intent, and to defer to the special trial judge’.s determinations of credibility. See Landry, v. FDIC, 204 F.3d 1125, 1133 (D.C. Cir. 2000). Such deference was a delegation of significant authority to the. special trial court judges. Many cases before the Tax Court, including the ones at issue in Freytag, “involve critical credibility assessments, rendering the appraisals of the [special trial] judge who presided at trial vital to the Tax Court’s ultimate determinations.” *1195 Ballard v. Comm’r, 544 U.S. 40, 60, 125 S.Ct. 1270, 161 L.Ed.2d 227 (2005). In Ballard, for example, “[t]he Tax Court’s decision repeatedly [drew] outcome-influencing conclusions regarding the credibility of Ballard ... and several other witnesses.” Id. And as the Freytag petitioners argued, “[f]indings of fact often conclusively decide tax litigation, as they did in [that] case.” Pet’rs’ Br. at 23, Freytag v. Comm’r, 501 U.S. 868 (1991) (No. 90-762), 1991 WL 111159. Thus, even when the special trial judge was not authorized to enter a final decision, his initial report often decided the case. The majority says this overstates the role of special trial judges, but it cannot be reasonably disputed that findings of fact “may well be determinative of guilt or innocence.” Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).
The majority barely mentions that the Tax Court was “required to defer” to the special trial judges’ factual and credibility findings “unless they were clearly erroneous.” Landry, 204 F.3d at 1133. But the powers of the special trial judges must be understood in context. As Freytag illustrates, a special trial judge’s initial decision is not like an ALJ’s—it is the difference between chiseling in stone and drafting in pencil.
The majority also fails to appreciate that the Tax Court appeared to defer to its special trial judges on conclusions of law as well. Bdt this point was squarely before the Supreme Court. As the Freytag petitioners argued, “[i]n practice, special trial judge factual findings and legal opinions are routinely adopted verbatim by the regular Tax Court judges to whom they are assigned.” Brief for Petitioner, supra, at 7. Between 1983 and 1991, when Freytag was decided, every initial report submitted by a special trial judge was purportedly adopted verbatim—a fact made known, to the Freytag Court. See Pet’rs’ Br., supra, at 6-10.
Every reported decision, including the Tax Court’s decision in Freytag, “invariably beg[an] with a stock statement that the Tax Court judge ‘agrees with and adopts the opinion of the special trial judge.’ ” Ballard, 544 U.S. at 46, 125 S.Ct. 1270 (citation omitted) (original brackets omitted); see, e.g., Freytag v. Comm’r, 89 T.C. 849, 849 (1987) (“The Court agrees with and adopts the opinion of the Special Trial Judge that is set forth below.”). Following that disclaimer was an opinion issued in the name of the special trial judge.
Freytag thus illustrates another point that the majority misses: the Tax Court may not have even reviewed the supposedly nonfinal decisions of its special trial judges. As the Freytag petitioners argued before the Supreme Court, that case was “a perfect example of. how special trial judges routinely do the Tax Court’s work with only the most cursory supervision, if any.” Pet’rs’ Br., supra, at 23. There, “after one of the longest trials in Tax Court history,” which involved “14 weeks of complex financial testimony spanning two years of trial” and which produced “9,000 pages of transcript and ... 3,000 exhibits,” the Tax Court purported to adopt the special trial judge’s report—verbatim—and filed it as the Tax Court’s decision on the very same day it received the report. Id. at 23, 9. As the Freytag petitioners argued to the Supreme Court, “[t]he special trial judge’s filing of his report and its verbatim adoption by [Tax Court] Chief Judge Sterrett appear from the record to have been virtually simultaneous.” Id. at 8. That decision resolved several unsettled, important legal questions. Yet, according to the docket, the Tax Court judge filed the decision as his own on the same day that the special trial judge filed his proposed findings and opinions. See id.[1]
*1196 The Freytag petitioners’ point was that special trial judges had as much authority as Tax Court judges themselves. The petitioners referred to them as “full-fledged surrogates for the Tax Court judges,” who “exercise virtually the same powers as presidentially-appointed Tax Court judges.” Id. at 12, 27. The Supreme Court, then, was thoroughly briefed on the true power of the special trial judges: In some cases, special trial judges could enter final decisions on behalf of the Tax Court. In others, special trial judges had, by rule, near-final say on outcome-determinative facts. And in practice they had de facto power “to issue findings and opinions that may be adopted verbatim by the Tax Court without meaningful review even in the most complex, significant and far-reaching cases, as they were [in Freytag].” Id. at 27. Thus, the special trial judges exercised “significant authority pursuant to the laws of the United States.” Freytag, 501 U.S. at 881, 111 S.Ct. 2631 (quoting Buckley v. Valeo, 424 U.S. 1, 126, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)).[2]
*1197 The majority says that “SEC ALJs closely resemble the STJs described in Freytag.” Maj. Op. at 1181. But that is simply not the case. The Securities and Exchange Commission, by contrast, is not required to give its ALJs any deference. The Commission may review its ALJs’ conclusions of law and findings of fact de novo. 17 C.F.R. § 201.411(a). It employs ALJs in its discretion, and all final agency orders are those of the Commission, not of its ALJs. An ALJ serving as a hearing officer prepares only an “initial decision.” Id. § 201.360(a)(1). And at any time during the administrative process, the Commission may “direct that any matter be submitted to it for review.” Id. § 201.400(a). The Commission thus “retains plenary authority over the course of its administrative proceedings and the rulings of its law judges—both before and after the issuance of the initial decision and irrespective of whether any party has sought relief.” Mendenhall, Exchange Act Release No. 74532, 2015 WL 1247374, at *1 (Mar. 19, 2015).[3]
On appeal, the Commission is not limited by the record before it. It “may expand the record by hearing additional evidence” itself or it may “remand for further proceedings.” Bandimere, SEC Release No. 9972, 2015 WL 6575665 (Oct. 29/ 2015) (internal quotation marks and brackets omitted). The Commission “may affirm, reverse, modify, set aside” the initial decision or remand, “in whole or in part,” and it “may make any findings or conclusions that in its judgment are proper and on the basis of the record.” 17 C.F.R. § 201.411(a). If “a majority of participating Commissioners do not agree to a disposition on the merits, the initial decision shall be of no effect.” Id. § 201.411(f).
The majority says that, like special trial judges, SEC ALJs also “exercise significant discretion.” Maj. Op. at 1179. But again the majority misses the point. It is not about day-to-day discretion—the Appointments Clause does not care about that. Special trial judges “exercise[d] significant discretion” in setting the record because the Tax Court was required to defer to its special trial judges’ findings. We say, for example, that a “district court has significant discretion in sentencing’’ because we “review for abuse of discretion.” United States v. Tindall, 519 F.3d 1057, 1065 (10th Cir. 2008); see also, e.g., Murphy v. Deloitte & Touche Grp. Ins. Plan, 619 F.3d 1151, 1164 (10th Cir. 2010) (recognizing that a district court has “substantial discretion in handling discovery requests,” because our standard of review is highly deferential). Similarly, a special trial judge had “significant discretion” because the Tax Court had to review its findings equally deferentially. The Commission, by contrast, does not have to review its ALJ’s opinions with any deference. An SEC ALJ, thus, does not exercise “significant discretion” in any meaningful way.
SEC ALJs, then,- possess only a “purely recommendatory power,” Landry, 204 F.3d at 1132, which separates them from constitutional officers. The Supreme Court has suggested as much. See Free Enter. Fund, 561 U.S. at 507, 130 S.Ct. 3138. In Free Enterprise Fund, the Court explained that its holding “does not address that subset of independent agency *1198 employees who serve' as administrative law judges” and that “unlike members of the [Public Company Accounting Oversight] Board,” who were officers, “many administrative law judges ,.. perform adjudicative rather than enforcement or policymaking functions, or possess purely recommendatory powers.” Id. at 507 n.10, 130 S.Ct. 3138 (citation omitted).
The results speak for themselves; Unlike the Tax Court, which purported to adopt its special tax judges’ opinions verbatim in 880 out of 880 cases between 1983 and 2005, the Commission followed its ALJs’ recommendations in their entirety in only 3 of the 13 appeals decided thus far in 2016.[4] In the other 10 cases, the Commission disagreed with its ALJs for various reasons: In one case, the Commission reversed its ALJ because the SEC Enforcement Division failed to meet its burden; in another, it held that civil penalties, which the ALJ had recommended, were not available due to the statute of limitations.
In the end, then, it is the Commission that “ultimately controls the record for review and decides what is in the record.” Lucia, 832 F.3d at 288 (citation omitted); see also Nash v. Bowen, 869 F.2d 675, 680 (2d Cir. 1989) (recognizing that, under 5 U.S.C. § 557(b), the agency “retains ‘all the powers which it would have in making the initial decision’ ”). It is the Commission that enters the final order—in all cases— and it is the commissioners who shoulder the blame.
The majority argues that the current process for selecting ALJs “does not lend itself to ... accountability,” Maj. Op. at 1181, but it is quite clear where the buck-stops, Because the Commission is not bound in any way by its ALJ’s decisions, unlike the Tax Court, the blame for its unpopular decisions will fall squarely on the commissioners and, in turn, the president who appointed them. So long as the commissioners have been validly appointed, the Appointments Clause is satisfied.
Putting aside that the Commission is not bound—in any way—by an ALJ’s recommendations, amici’s attempt to analogize SEC ALJs to magistrate judges only serves to highlight the difference between ALJs and constitutional officers. Unlike ALJs, magistrate judges have been delegated sovereign authority and have the power to bind the government and third parties. Magistrate judges are authorized to issue arrest warrants, 18 U.S.C. § 3041; determine pretrial detention, id. §§ 3141, 3142; detain a material witness, id. § 3144; enter a sentence for a petty offense, without the consent of the United States or the defendant, 28 U.S.C. § 636(a)(4); and issue final judgments in misdemeanor cases and all civil cases with the consent of the parties, id. § 636(a)(5), (c); 18 U.S.C. § 3401. Magistrate judges may also impose sanctions for contempt. 28 U.S.C. § 636(e). SEC ALJs can do none of these things.
The majority’s reliance on Supreme Court decisions from the nineteenth century and early twentieth century is equally problematic. The majority’s casual citation to these cases might lead one to believe there is a body of caselaw to which we can *1199 analogize. But these decisions “often employed circular logic, granting officer status to an official based in part upon his appointment by the head of a department.” Landry, 204 F.3d at 1132-33. For example, United States v. Mouat, 124 U.S. 303, 8 S.Ct. 505, 31 L.Ed. 463 (1888), cited by the majority, held that “[u]nless a person ... holds his place by virtue of an appointment by the President, or of one of the courts of justice or heads of Departments authorized by law to make such an appointment, he is not, strictly speaking, an officer of the United States.” Id. at 307, 8 S.Ct. 505; see also Free Ent. Fund, 561 U.S. at 539, 130 S.Ct. 3138 (Breyer, J., dissenting) (quoting commentary that described “early precedent as ‘circular’ and [the Court’s] later law as ‘not particularly useful’ ”).
Finally, Í began this dissent by expressing my fears of the probable consequences of today’s decision. It does more than allow malefactors who have abused the financial system to escape responsibility. Under the majority’s reading of Freytag, all federal ALJs are at risk of being declared inferior officers. Despite the majority’s protestations, its holding is quite sweeping, and I worry that it has effectively rendered invalid thousands of administrative actions. Today’s judgment is a quantitative one—it does not tell us how much authority is too much. It lists the duties of SEC ALJs, without telling us which, if any, were more important to its decision than others and why. And I worry that this approach, and the end result, leaves us with more questions than it answers.
Are all federal ALJs constitutional officers? Take, for example, the 1,537 Social Security Administration (SSA) ALJs,[5] who collectively handle hundreds of thousands of hearings a year.[6] SSA ALJs, like SEC ALJs, are civil service employees in the “competitive service” system. 5 C.F.R. § 930.201(b). In addition to presiding over sanctions actions, which are adversarial, see 20 C.F.R. § 404.459, SSA ALJs conduct nonadversarial hearings to review benefits decisions, see id. §§ 404.900, 405.1(c), 416.1400. In these proceedings, the claimant may appear, submit evidence, and present and question witnesses. Id. §§ 404.929, 404.935, 416.1429, 416.1435. Like SEC ALJs, SSA ALJs “regulate the course of the hearing and the conduct of representatives, parties, and witnesses.” Id. § 498.204(b)(8). Like SEC ALJs, SSA ALJs administer oaths and affirmations', see id. § 404.950, and examine witnesses, id. § 498.204(b)(9). Like SEC ALJs, SSA ALJs may receive, exclude, or limit evidence. Id. § 498.204(b)(10).
If a claimant is dissatisfied with an SSA ALJ’s decision, he may seek the SSA’s Appeals Council’s review. The Appeals Council may then deny or dismiss the request for review or grant it. Id. §§ 404.967, 416.1467. Like the Securities and Exchange Commission, the Appeals Council may also review an ALJ’s decision on its own motion. Id. §§ 404.969(a), 416.1469(a). After it has reviewed all the evidence in the ALJ’s hearing record and any additional evidence received, the Appeals Council will make a decision or remand the case to an ALJ. Id. §§ 404.977, 404.979, 416.1477, 416.1479. The Appeals Council may affirm, modify or reverse the ALJ’s decision. Id. If no review is sought and the Appeals Council does not review the ALJ’s decision on its own motion, the *1200 ALJ’s decision becomes final. See id. §§ 404.955, 404.969, 416.1455, 416.1469.
This should all sound familiar. SSA ALJs have largely the same duties as SEC ALJs, and the appeals process appears similar as well. But the parallels between SEC ALJs and SSA ALJs do not end there. Like SEC ALJs, SSA ALJs can hold prehearing conferences, id. § 405.330; punish contemptuous conduct by excluding a person from a hearing, see Social Security Administration Hearings, Appeals and Litigation Law Manual (HALLEX), 1-2-6-60 (Jan. 15, 2016)[7]; rule on dispositive and procedural motions, 20 C.F.R. § 498.204(b); rule on sanctions, see HAL-LEX, 1-2-10-16; and take depositions, see HALLEX, 1-2-6-22. Like SEC ALJs, an SSA ALJ “may, on his or her own initiative or at the request of a party, issue subpoenas for the appearance and, testimony of witnesses and for the production of books, records, correspondence, papers, or other documents that are material to an issue at the hearing.” 20 C.F.R. § 404.950. Like SEC ALJs, though, SSA ALJs cannot enforce or seek enforcement of a subpoena; the SSA itself would have to get an order from a federal district court to compel compliance. See 42 U.S.C. § 405(e).
This is all to say that SEC ALJs are not unique. I cannot discern a meaningful difference between SEC ALJs and SSA ALJs under the majority’s reading of Freytag. Indeed, litigants have already begun drawing this precise comparison between SEC ALJs and SSA ALJs. See, e.g., Manbeck v. Colvin, No. 15 CV 2132, 2016 WL 29631 (S.D.N.Y. Jan. 4, 2016). Insofar as SSA ALJs are not appointed by the president, a court of law, or the head of a department, cf. O’Leary v. Office of Pers. Mgmt., No. DA-300A-12-0430-B-1, 2016 WL 3365404 (M.S.P.B. June 17, 2016), today’s decision risks throwing much into confusion. “Does every losing party before an ALJ now have grounds to appeal on the basis that the decision entered against him is unconstitutional?” Free Enter. Fund, 561 U.S. at 543, 130 S.Ct. 3138 (Breyer, J., dissenting). It certainly seems that way.
And what of the ALJs going forward? When understood in conjunction with Free Enterprise Fund, I worry today’s opinion will be used to strip ALJs of their dual layer for-cause protection. In Free Enterprise Fund, the Supreme Court held that “dual for-cause limitations on the removal” of some inferior officers is unconstitutional. 561 U.S. at 492, 130 S.Ct. 3138. Presently, SEC ALJs (and SSA ALJs) have such dual for-cause protection: An SEC ALJ may only be removed by the Merit Systems Protection Board and only for good cause. See 5 U.S.C. § 7521(a), (b). The members of the Merit Systems Protection Board are themselves protected from at-will removal. Id. at § 1202. I appreciate that this issue is not before the court, but today’s decision makes it more likely that either ALJs or the Board, or both, will lose this civil service protection. See Free Enter. Fund., 561 U.S. 477, 542, 525, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (Breyer, J., dissenting).[8]
I am similarly concerned about what the majority’s decision portends for untold rules and regulations. “Although almost all rulemaking is today accomplished through informal notice and comment, the APA actually contemplated a much more formal process for most rulemaking. To that end, *1201 it provided for elaborate trial-like hearings in which proponents of particular rules would introduce, evidence and bear .the burden of proof in , support of those proposed rules.” Perez v. Mortg. Bankers Ass’n, — U.S. —, 135 S.Ct. 1199, 1222 n.5, 191 L.Ed.2d 186 (2015) (Thomas, J., concurring) (citing 5 U.S.C. § 556).
Formal rulemaking proceedings must be presided over by an agency official or an ALJ. An ALJ’s function in formal rule-making is nearly identical to its function in formal adjudications. See 5 U.S.C. §§ 556, 557. So, if ALJs are officers for purposes of formal adjudication, as the majority so holds, they must also be officers for formal rulemaking. See also Freytag, 501 U.S. at 882, 111 S.Ct. 2631 (“Special trial judges are not inferior officers for purposes of some of their duties under § 7443A, but mere employees with respect to other responsibilities .... If a special trial judge is an inferior officer for purposes of subsections (b)(1), (2), and (3), he is an inferior officer within the meaning of the Appointments Clause and he must be properly appointed.”). Though formal rulemaking is much rarer today, see Perez 135 S.Ct. at 1222 n.5, this was not always the case. And I worry that rules and regulations that were promulgated via formal rulemaking before an agency ALJ and are still enforced today are now constitutionally suspect.[9]
Today’s holding risks throwing much into disarray. Since the Administrative Procedures Act created the position of administrative law judge in 1946, the federal government has employed thousands of ALJs to help with the day-to-day functioning of the administrative state. Freytag, which was decided 25 years ago, has never before been extended by a circuit court to any ALJ. And yet, the majority is resolved to create a circuit split. When there are competing understandings of Supreme Court precedent, I would prefer the outcome that does the least mischief.
Furthermore, faced with such uncertainty, “we must hesitate to upset the compromises and working arrangements that the elected branches of .Government themselves have reached.” NLRB v. Noel Canning, — U.S. —, 134 S.Ct. 2550, 2560, 189 L.Ed.2d 538 (2014). Judicial review must fit the occasion. In a close case regarding the application of a constitutional rule in a discrete factual setting, and without much precedent to guide us, deference to Congress seems particularly relevant. I respectfully dissent.

. .The majority's emphasis on Ballard is misplaced; that, case has little to do with the *1196 question before us. In Ballard, a case decided 14 years after Freytag, the government averred that a Tax Court special trial judge’s report was treated as an "in-house draft to be worked over collaboratively by the regular [Tax Court] judge and the special trial judge." See 544 U.S. 40, 57, 125 S.Ct. 1270. The majority puts this averment forward as fact, but the Ballard Court "[did] not know what happened in the Tax Court, a point that is important to underscore here.” Ballard, 544 U.S. at 67, 125 S.Ct. 1270 (Kennedy, J., concurring). Indeed, the Court could not have known: the special trial judges’ initial reports were not disclosed even to the Supreme Court. As the concurring opinion clarified, Ballard should be interpreted "as indicating that there might be such a practice, not that there is.” Id. The majority ignores this. The majority also fails to explain why Ballard should color an interpretation of Freytag when the puiported practice had not yet been disclosed, let alone put in front of the Freytag Court.
The majority next states that there is "no indication” the Tax Court judge in Freytag adopted the STJ's report "verbatim”—but the Tax Court judge purported to do just that. Freytag, 89 T.C. at 849. Indeed, "[i]n the 880 cases heard between ... 1983 and ... 2005, there appear to be no instances in which a special trial judge issued-a report and recommendation that the Tax Court publicly modified or rejected.” Christopher M. Pietruszkiewicz, Conflating Standards of Review in the Tax Court: A Lesson in Ambiguity, 44 Houston L. Rev. 1337, 1360 (2008). What’s more, after Ballard was decided, the Tax Court tried to make good by releasing the undisclosed reports from every case heard initially by special trial judge since 1983. Louise Story, Tax Court Lifts Secrecy, Putting Some Cases in New Light, N.Y. Times, Sept. 24, 2005, at C6. It could find initial reports in only 117 of the 923 cases. Id. Of those 117 cases, the Tax Court modified the special trial judges’ recommendations only 4 times. Id. Such figures demonstrate the level of deference afforded to special trial judges.
Following its lengthy discussion of the Tax Court's purported collaborative practice, the majority says "[w]hat really counts 7.. are the- STJs features the Supreme Court relied on” in Freytag. Maj. Op. at 1187. But Freytag did not "rely” on this purported practice— indeed; it had not yet been disclosed by the Tax Court. Taking the majority at its word, its own reliance on Ballard seems out of place. Instead, we should look to what'was actually before the Freytag Court.
In any event, whether the Tax Court in practice deferred to the special trial judges on both facts and law, or whether it directed the outcome of a case while escaping responsibility by disclaiming the decision is a distinction without a difference. Either way, the Appointments Clause would be offended.

. Put another way, the special trial judges had been delegated a portion of the sovereign powers of the federal government; they could act on behalf of the Tax Court, and they had the power to bind third parties and the government itself. See Lucia, 832 F.3d at 285. Delegated sovereign authority has long been understood to be a key characteristic of a federal "office.” See 31 Op. O.L.C. 73 (reviewing historical precedents leading up to Buckley). And it is delegated sovereignty that is lacking here.

. It is true, as the majority points out, that the Commission may sometimes defer to the credibility determinations of its ALJs. But because the Commission has retained plenary authority over its ALJs, it is "not required to adopt the credibility determinations of an ALJ." Lucia, 832 F.3d at 288 (citation omitted). By contrast, the Tax Court was required to defer .to its special trial judges. In my estimate, this power to bind the government is, in large part, what separates "purely recommendatory power” from "significant authority,” and ALJs from.special trial judges.

. See Grossman, Release No. 10227, 2016 WL 5571616 (Sept. 30, 2016); Schalk, Release No. 10219, 2016 WL 5219501 (Sept. 21, 2016); Cohen, Release No. 10205, 2016 WL 4727517 (Sept. 9, 2016); optionsXpress, Inc., Release No. 10125, 2016 WL 4413227 (Aug. 18, 2016); Gonnella, Release No. 10119, 2016 WL 4233837 (Aug. 10, 2016); Aesoph, Release No. 78490, 2016 WL 4176930 (Aug. 5, 2016); Malouf, Release No. 10115, 2016 WL 4035575 (July 27, 2016); J.S. Oliver Capital Management, L.P., Release No. 10100, 2016 WL 3361166 (June 17, 2016); Riad, Release No. 78049, 2016 WL 3226836 (June 13, 2016); Page, Release No. 4400, 2016 WL 3030845 (May 27, 2016); Doxey, Release No. 10077, 2016 WL 2593988 (May 5, 2016); Young, Release No. 10060, 2016 WL 1168564 (March 24, 2016); Wulf, Release No. 77411, 2016 WL 1085661 (Mar. 21, 2016).

. See Office of Pers. Mgmt., AUs by Agency, https://www.opm.gov/services-for-agencies/ administrative-law-judges/#url=AUs-by-Agency (last visited Oct. 31, 2016). According to the Office of Personnel Management’s latest count, there are 1,792 total federal administrative law judges, Id.

. See SSA, Annual Performance Report 2014-2016, Table 3,lh, at 82, available at http:// www.ssa. gov/agency/performance/2016/ FINAL-2014_2016_APR_508_compliant.pdf.

. Available at https://www.ssa.gov/OP_Home/ hallex/hallex-I.html.

. Whether federal ALJs should receive such dual for-cause protections is perhaps a question that could be debated, but Congress has already decided this question in favor of protecting ALJs, and the majority opinion shows little concern for the way its decision will overturn congressional intent and disrupt a system that has been in place for decades.

. Some of these questions could, perhaps, be resolved by an explicit statement that the opinion does not apply retroactively. See e.g., Buckley, 424 U.S. at 142, 96 S.Ct. 612 (holding that the appointment of some Commissioners violated the Appointments Clause, but that the “past acts of the Commission are therefore accorded de facto validity,” even though "[t]he issue [was] not before [the Court].” Id. at 744, 106 S.Ct. 3181 (Burger, C.J., concurring in part and dissenting in part)). But see Maj. Op. 1188 ("Questions about ... retroactivity are not issues on appeal .... we must leave for another day any putative consequences of [our] conclusion.”).